UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CASE NO.:   1:22-CR-28-HAB |
| ) | |
| ELIJAH SHORES ) | |

## OPINION AND ORDER

Elijah Shores ("Shores") is facing a six-count gun and drug indictment resulting from controlled buys and items found during the search of an apartment located at 5131 Stonehedge Boulevard ("5131 Stonehedge") in the Canterbury Green Apartment complex ("Apartment 9"). (Indictment, ECF No. 1).[1] Shores now moves to suppress the evidence obtained from Apartment 9 claiming that the issuing magistrate judge did not have a substantial basis for his probable cause determination. (ECF No. 44). Because the Court finds that the magistrate judge correctly determined the existence of probable case, the motion will be DENIED.

## SEARCH WARRANT AFFIDAVIT

On February 21, 2022, Detective Tina Dickey ("Det. Dickey") applied for a search warrant for Apartment 9 (ECF No. 42-1). The application, supported by Det. Dickey's affidavit, stemmed from an ongoing investigation that began with an anonymous tip made to Captain Kevin Hunter ("Capt. Hunter") of the Fort Wayne Police Department (FWPD) in early January 2022. The tipster advised Capt. Hunter that the occupants of Apartment 9 appeared to be conducting hand to hand deals in and around the apartment.

---

[1] The first paragraph of the affidavit describes the layout of the Canterbury Green Apartment complex. The complex is comprised of multiple buildings with each building having a different street address displayed horizontally above the common building entrance door. 5131 Stonehedge has 12 units inside the building. The apartment number is displayed on the specific door to each apartment.

On January 20, 2022, Det. Dickey was contacted by a confidential informant ("CI") who advised her that they could purchase M-30 pills from an acquaintance ("Suspect 1") who is supplied by another individual ("Suspect 2"). Det. Dickey then arranged a controlled buy between the CI and Suspect 1.

After utilizing all the normal controlled buy procedures – pre-and post-buy searches of the CI, outfitting the CI with a recording device, and use of pre-recorded buy money -- the CI drove with Suspect 1 to Canterbury Green Apartments. Suspect 1 left the vehicle with the pre-recorded buy money and went to 5131 Stonehedge, presumably to meet with Suspect 2. Suspect 1 returned to the vehicle with M-30 pills, later determined to be counterfeit and field tested positive for fentanyl. The CI advised Det. Dickey that Suspect 1 referred to Suspect 2 as "Eli" and that the CI believed that to be Defendant, Elijah Shores.

Investigation by law enforcement into Apartment 9 revealed that it was leased to Lenora Shores and the vehicle registered to that apartment was a black Audi with a temporary license plate of 414B510. The Audi was registered to Aston and Lyleah Shores. Canterbury Green Management also reported to law enforcement that it had received complaints of unlawful drug activity at and around 5131 Stonehedge and that it had issued notices to the building's occupants in January 2022 that this activity should cease immediately.

Further controlled buys on January 24, January 26, and January 27, were arranged by Det. Dickey between a CI[2] and Suspect 1. During the January 24 controlled buy, the CI drove with Suspect 1 to a shopping center. The CI remained in the vehicle while Suspect 1 exited with the pre-recorded buy money and met with Suspect 2 in a black car. Suspect 1 then returned to the

---

[2] The Court has only been provided with a redacted copy of the search warrant affidavit. The CI's identity has been redacted from the affidavit and thus, the Court is unable to confirm whether the CI's identified on these three occasions are the same CI as the one on January 20, 2022. The Court believes it is the same CI referred to throughout the affidavit but cannot be certain.

original vehicle with M-30 pills that later tested positive for fentanyl. A similar scenario unfolded for the January 26 and 27 controlled buys although the locations differed. During the January 26 controlled buy, FWPD officers surveilling the CI and Suspect 1 observed them arrive at a gas station. Suspect 1 entered a black Honda driven by a black male. A positive identification of the black male driving the Honda was not made but the license plate for the Honda was registered to a female that was incarcerated. During the January 27 controlled buy, FWPD Detectives surveilling the CI and Suspect 1, observed Suspect 1 meet with the same Honda with the same license plate that was at the previous controlled buy. Again, the driver of the Honda could not be identified. The Honda was observed moving to an adjacent parking lot, met with another individual and returned to Suspect 1's location. From her training and experience, Det. Dickey believes that quick meets in parking lots are indicative of narcotics transactions.

      The next morning, a FWPD Detective observed the black Honda parked in the parking spots near 5131 Stonehedge.

      More controlled buys followed in the same way as all the prior controlled buys. During a controlled buy on January 31, 2022, the CI identified the black male individual Suspect 1 met with to be Defendant. On February 1, 2022, FWPD Detectives conducted surveillance at 5131 Stonehedge. Detectives observed a male black individual exit the building and get into the black Audi registered to Apartment 9. Detectives followed the Audi to Glenbrook Mall and observed the individual in the Audi exit the vehicle and enter the mall. Det. Dickey was working in a plain clothes capacity and followed the individual into the mall. Det. Dickey had previously reviewed photographs of Defendant, noting that he had distinctive tattoos on his person. Det. Dickey identified Defendant as the individual driving the black Audi. On February 4, Det. Dickey

3

observed Defendant again driving the black Audi and a different FWPD Detective observed the Audi parked in the designated parking spot for Apartment 9. All told, Defendant was observed driving the black Audi and parked near 5131 Stonehedge on February 1, 4, and 11, 2022.

On February 7, 2022, Det. Dickey conducted surveillance outside 5131 Stonehedge. During this surveillance, Det. Dickey observed a gold Impala arrive and park next to the Audi. After a short time, the driver exited the vehicle and went inside 5131 Stonehedge. A minute later, the same male exited 5131 Stonehedge, returned to the vehicle and 9 minutes later left the parking lot. A few minutes later, Det. Dickey observed a Kia arrive. Shores, coming from 5131 Stonehedge, entered the passenger seat of the Kia, stayed one minute and then exited the vehicle to return to 5131 Stonehedge. Less than an hour later, Det. Dickey observed a Jeep arrive and park near 5131 Stonehedge. The Jeep's passenger exited the vehicle and went to the door of 5131 Stonehedge where the individual met with someone briefly, returned to the Jeep and left the area. Traffic stops were made on the Impala and the Jeep and the affidavit reflects there was "no further involvement" of these vehicles. Based on her training and experience, Det. Dickey believes that these quick meets at vehicles and the other activity she observed are indicative of narcotics transactions taking place.

The final controlled buy occurred on February 15, 2022. On that date, a different CI[3] advised that they could purchase M-30 pills from "E." Det. Dickey was familiar with "E" and suspected this to be the same individual as Elijah Shores. Consistent with Det. Dickey's prior knowledge, the CI advised that "E" drives a black Honda or Audi and meets the CI in different parking lot locations. As with the other controlled buys, all the usual controlled buy procedures were followed. Det. Dickey drove the CI to Canterbury Green apartments and dropped the CI off

---

[3] As noted earlier, the Court has no information as to whether the CI's used are all the same individual or multiple different individuals. In its brief, the Government represents that on February 15, "Det. Dickey was contacted by a different CI…" (ECF No. 46 at 7.).

at the clubhouse. Det. Dickey observed a male black subject wearing a red hoodie and black pants greet the CI and enter the clubhouse. A few minutes later, the CI returned to Det. Dickey's vehicle with M-30 pills and the two left the area. A few minutes later, Det. Heath, a detective assisting with surveillance, observed the male black subject with the red hoodie and black pants walk to 5131 Stonehedge. Det. Heath positively identified the male black subject as Defendant.

Based on this information, Allen Superior Court Magistrate Keirns, determined that probable cause existed to search Apartment 9 for evidence of drug trafficking activities.

## DISCUSSION

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, "a neutral magistrate must decide [whether] probable cause [exists] before the police conduct a search." *United States v. Taylor*, 63 F.4th 637, 648 (7th Cir. 2023). To satisfy probable cause, "a warrant application must contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place." *United States v. Roland*, 60 F.4th 1061, 1064 (7th Cir. 2023) (citation and internal quotation marks omitted). "The application for a warrant 'must provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). But before the Court can turn to the probable cause determination, it must first address the preliminary matter of whether the Defendant had standing to contest the search of the apartment.

1. ***Standing***

Before a person can assert a Fourth Amendment claim, he must have a subjective and reasonable expectation of privacy in the place being searched. *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Katz v. United States*, 389 U.S. 347, 361 (1967) (J. Harlan, concurring). "The Supreme Court has consistently held that 'Fourth Amendment rights are personal rights which ... may not be vicariously asserted.'" *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)). In other words, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134 (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)). Whether a defendant can challenge a search is an issue of substantive Fourth Amendment law. *See Carlisle*, 614 F.3d at 756 (citing *Rakas*, 439 U.S. at 143). That substantive law "protects against ... intrusions by the government into areas in which that individual holds a reasonable expectation of privacy." *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007) (citing *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007)).

"A defendant seeking to suppress the fruits of a search bears the burden of demonstrating both that he held an actual subjective expectation of privacy and that the expectation 'is one that society is prepared to recognize as reasonable.'" *Villegas*, 495 F.3d at 767 (quoting *Yang*, 478 F.3d at 835). "[The court's] inquiry into whether a defendant's expectation of privacy was reasonable is necessarily fact dependent, and whether a legitimate expectation of privacy exists in a particular place or thing must be determined on a case-by-case basis." *Villegas*, 495 F.3d at 767 (citations and internal quotation marks omitted). A court considers several factors, including whether the defendant has an ownership interest in the place searched, whether he has the right to exclude others from the place, whether he has a subjective expectation that the place will

6

remain free from government invasion, whether he took cautions to maintain privacy, and whether he was legitimately on the premises. *See Carlisle*, 614 F.3d at 758; *United States v. Peters,* 791 F.2d 1270, 1281 (7th Cir. 1986).

The probable cause affidavit is the only evidence the parties submitted to the Court. The affidavit indicates that Apartment 9 was leased to Lenora Shores. A vehicle (black Audi) associated with Apartment 9 and permitted to park at Apartment 9 was registered to Aston and Lyleah Shores. Physical surveillance described in the affidavit showed Defendant driving that vehicle and parking at the apartment complex on a few occasions.

In his motion, Defendant argues "there is nothing in the affidavit that suggests that Shores lives at apartment 9…" (ECF No. 44 at 5). Instead, he states that "the only inference that can be drawn here is that Shores occasionally uses a family members['] Audi, not that he is selling drugs out of that same family members['] apartment." (*Id.* at 4-5). He also states that the "only information that in anyway associates Shores to apartment 9 is that it is leased to a person with the same last name (though the affidavit never confirms any relation)." (*Id.* at 4).

Because, in the Court's view, Defendant's brief was both disclaiming any interest in the apartment and challenging its search, the Court ordered additional briefing. That briefing has been received (ECF Nos. 51, 52), and the Court now finds that the Defendant has sufficiently established his Fourth Amendment interest in the place searched. *United States v. Carter,* 53 F.3d 418 (7th Cir. 2009).

The Seventh Circuit has made it clear that "without an affidavit or testimony from the defendant, it is almost impossible to find a privacy interest ...." *United States v. Mendoza,* 438 F.3d 792, 795 (7th Cir. 2006). To this end, the Defendant submitted an affidavit (ECF No. 51-1) acknowledging that at all time periods referenced in the Search Warrant Affidavit he "resided at

7

5131 Stonehedge Blvd, Apartment 9." The Government concedes that the Defendant's affidavit meets his burden to establish Fourth Amendment standing and thus, the Court moves on to an assessment of probable cause.

2. ***Probable Cause***

When an affidavit is the only evidence presented to a judge to support a search warrant, as it is here, the validity of the warrant hinges on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009). A search warrant affidavit establishes probable cause when, based on the totality of circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005) (citing *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003)). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (ellipsis and brackets omitted).

This Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). Det. Dickey's affidavit (and the inferences the Magistrate may draw from the affidavit)[4] leaves no doubt that the Magistrate properly determined that probable cause existed to search Apartment 9 for evidence of drug trafficking activities. Although Shores views the evidence piecemeal, the totality of the circumstances here connects all the dots. See *United States v. Carswell*, 996 F.3d 785, 793 (7th Cir. 2021) ("When we evaluate a probable cause finding, we do not view the individual facts in isolation.").

---

[4] "[I]ssuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018).

Shores focuses on the anonymous tip and argues that the tip was insufficiently reliable to support probable cause. The Court wholly agrees that an attempt to obtain a warrant based on the anonymous tip, without more, would have been problematic. But what Shores ignores is all the investigative work that followed the anonymous tip.

Det. Dickey's affidavit sets forth in detail that almost two weeks after receiving an anonymous tip that drug transactions were occurring at Apartment 9, Det. Dickey was contacted by a CI who informed her that they could purchase M-30 pills from Suspect 1 who was supplied through Suspect 2. Controlled buys and physical surveillance followed wherein Det. Dickey's investigation was drawn repeatedly to 5131 Stonehedge where Apartment 9 is located:

- the CI rode with Suspect 1 to 5131 Stonehedge, entered 5131 Stonehedge, and returned with drugs (January 20);

- the CI advised Det. Dickey that Suspect 2 was referred to by Suspect 1 as "Eli" and the CI suspected "Eli" to be the Defendant (January 20);

- during the January 24, January 26, and January 27 buys, Suspect 1 met with an individual in a black car or black Honda;

- on January 28, the black Honda was parked in one of the spots near 5131 Stonehedge;

- on January 31, the CI positively identified the Defendant meeting with Suspect 1 and after Suspect 1 met with Defendant, Suspect 1 provided M-30 pills to the CI;

- on February 15, Defendant was positively identified by a different CI, who knew him as "E" and told Det. Dickey he drove a black Audi or Honda. Defendant was observed by law enforcement walking to the controlled buy location, entering the clubhouse, and then walking back to the parking area associated with 5131 Stonehedge.

Shores argues that none of the above facts links drug trafficking activity specifically to Apartment 9 and, in turn, there was no probable cause to search it. This is true, in part. Nothing in the above facts provide a direct link to Apartment 9, but it certainly does connect Defendant with drug trafficking activity.

9

The link to Apartment 9 comes from other portions of the investigation. Apartment 9 is leased to Lenora Shores and the vehicle registered with Canterbury Green to park at Apartment 9 was the black Audi. The black Audi was registered to other individuals with the Defendant's last name. It is certainly a reasonable inference that these individuals were related to Defendant. But then there is the fact that physical surveillance observed Defendant, at least 3 times, driving the black Audi registered to Apartment 9, and parking it in the designated spot for Apartment 9. Finally, surveillance revealed multiple dates and times where officers observed instances where quick meets outside of 5131 Stonehedge, all of which their experience and training associated with drug trafficking activities.

"Probable cause does not require direct evidence linking a crime to a particular place." *United States v. Zamudio,* 909 F.3d 172, 175 (7th Cir. 2013). Instead, an affidavit submitted in support of a search warrant "need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place." *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010). "[N]either an absolute certainty nor even a preponderance of the evidence is necessary." *Id.*

Det. Dickey's affidavit did not need to include direct evidence linking criminal activity to Apartment 9. Indeed, an issuing magistrate judge "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991). The Court cannot fault the Magistrate's determination that evidence of drug trafficking was likely to be found in an apartment leased to an individual bearing the Defendant's last name: (1) Defendant was observed trafficking drugs in the parking lot and clubhouse of that apartment complex; (2) Detectives

observed multiple instances of "short-stay" traffic indicative of drug trafficking at 5131 Stonehedge; (3) Defendant was identified leaving 5131 Stonehedge in a car registered to individuals bearing his last name on at least 3 occasions; (4) the anonymous tip specifically referencing Apartment 9; and (5) surveillance demonstrated that it was likely Defendant spent significant time at an apartment unit connected to 5131 Stonehedge. Simply put, the facts described in the search warrant create a reasonable inference that evidence of drug activity would be present in Apartment 9.

### 3. *Good Faith Exception*

Even if the Court were to assume that probable cause was lacking, the evidence here would very likely survive under the good faith exception principle of *United States v. Leon,* 468 U.S. 897 (1984). It is well settled that under *Leon,* the suppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause. *Leon,* 468 U.S. at 920–24. An officer's decision to obtain a warrant is *prima facie* evidence that he or she was acting in good faith. *United States v. Otero,* 495 F.3d 393, 398 (7th Cir. 2007). A defendant can rebut the presumption of good faith only by showing (1) that the issuing judge abandoned his or her detached and neutral role, (2) the officers were dishonest or reckless in preparing the affidavit, or (3) the warrant was so lacking in probable cause as to render the officer's belief in its existence entirely unreasonable. *Id.*

The Government asserts that the good faith exception would apply to shield evidence recovered during the search from suppression if the Court found an impropriety in the warrant's issuance. No doubt under the facts here, Defendant would have an uphill battle. "Overcoming the presumption of good faith is no small feat, as an officer cannot ordinarily be expected to question

a judge's probable cause determination." *United States v. Adams,* 934 F.3d 720, 726-27 (7th Cir. 2019). But rather than address this argument in his briefing, Shores requests that if the Court finds the warrant invalid that he be permitted to brief the issue of good faith. The Court finds additional briefing unnecessary in light of its determination that the warrant was validly issued.

## CONCLUSION

Based on the above reasoning, the Defendant's Motion to Suppress (ECF No. 42) is DENIED. A scheduling order will be issued separately.

SO ORDERED on April 22, 2024.

s/ <i>Holly A. Brady</i><br>
CHIEF JUDGE HOLLY A. BRADY<br>
UNITED STATES DISTRICT COURT